**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 27, 2009

Charles R. Fulbruge III
Clerk

No. 08-50820

MARY HALE; WAYNE HALE; JENNIFER HARRIS; HAROLD HARRIS;
DARRELL SCRAPER

Plaintiffs-Appellants

v.

BEXAR COUNTY, TEXAS

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:06-CV-0562

Before REAVLEY, DAVIS, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

This is an appeal from a summary judgment granted in favor of Appellee
Bexar County in a suit stemming from a train derailment and related events
that resulted in the death and injury of residents in the nearby area.
Appellants—Wayne and Mary Hale (the "Hales"), residents of the area in which
the train derailed, and Darrell Scraper, Harold Harris, and Jennifer Harris,
members of the Southwest Volunteer Fire Department ("SWFD")—sued Bexar
County and Bexar County Sheriff's Office Lieutenant Kyle Coleman ("Lt.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

Coleman") under 42 U.S.C. § 1983, alleging that they prevented attempted rescue efforts by volunteer rescuers which could have limited the Hales' injuries related to the train derailment. Appellants appeal the district court's grant of summary judgment in favor of Bexar County. For the following reasons, we affirm the judgment of the district court.

I.

On June 28, 2004, a train carrying chlorine gas derailed near the Hales' home of in Bexar County, outside of the city of San Antonio. The train derailment was within two-hundred yards of the home. The Hales were awakened by the sound of the derailment and the smell of the concentrated chlorine gas. Mary Hale reported the crash to a Bexar County 911 operator, who notified the Southwest Volunteer Fire Department. The incident was within the jurisdiction of SWFD and outside the city limits of the City of San Antonio. Plaintiffs Harold and Jennifer Harris, in their capacities as assistant chief and lieutenant of the SWFD, were dispatched to the scene. The Harrises reached the scene at 5:15 a.m., followed by deputies from the Bexar County Sheriff's Office ("BCSO") and SWFD Chief Darrell Scraper.

As they approached the scene, a BCSO patrol unit and a SWFD motor unit drove into a cloud of chlorine gas. The gas was leaking from a ruptured tank car on the train. The two lead vehicles were overcome by the chlorine gas. The sheriff's deputy was able to back his vehicle out and escape, but an injured firefighter became incapacitated and was rescued by SWFD Chief Harris. After the injured firefighter was transported for medical treatment, the SWFD rescuers put on their bunker gear and self-contained breathing apparatuses, which provided limited protection from the leaking chlorine gas, and returned to the scene. Within an hour of the derailment, the Bexar County dispatcher advised SWFD and BCSO of the chlorine gas and the wind direction. A BCSO sergeant instructed all BCSO units to stay clear of the scene.

At 6:00 a.m., Mary Hale made another call to 911, reporting that she, her husband, and her brother-in-law were having serious trouble breathing and were attempting to evacuate in their vehicle. Mary Hale informed dispatch that their access to the road was blocked by a neighbor's locked gate, which prevented them from driving their vehicle or walking to evacuate the area.

SWFD Chief Scraper arrived at the scene around 6:00 a.m. and established a forward command position, while Chief Harris retained his authority as incident commander. San Antonio Fire Department ("SAFD") personnel began arriving on the scene and were briefed by SWFD. Around 6:15 a.m. Harris and SWFD Capt. Nolen found and rescued the train engineer, carried him east away from the wreckage for about ten minutes, and waited for a SWFD rescue vehicle. The two rescuers, still in their bunker gear, returned to the wreckage to search for the missing train conductor.

Around 6:30 a.m., SWFD was notified that nearby residents, including the Hales, were trapped at 9281 Nelson Road. SAFD and SWFD discussed options for rescuing the Hales and SWFD, equipped with bunker gear and self-contained breathing apparatuses, prepared to approach the Hales' residence through a cornfield upwind from the spill. At 7:00 a.m. Harris and Nolen further investigated the wreckage and crossed under the train on foot, heading east upwind, looking for a safe rescue approach. Chief Scraper instructed the rescuers to take their truck to initiate the rescue. Appellants allege that this attempt was thwarted by BCSO deputies who would not let SWFD move their vehicle closer to the wreckage. Appellants allege that in accordance with Bexar County's interpretation of the Bexar County Emergency Management Plan (Annexes F & Q), the mutual aid agreement among local governmental agencies, as well as National Incident Management System protocols and procedures, Bexar County determined that SAFD would be the exclusive agency to approach the accident scene and attempt a rescue, concluding that no other rescuers would

be allowed to attempt a rescue. Mary Hale was still in contact with the Bexar County dispatcher, and informed her that she and her husband were still in their vehicle trying to escape the chlorine cloud, but were unsuccessful because of the blocked road. The Hales were still having serious trouble breathing. The dispatcher maintained contact, indicated help was "on the way," and advised the Hales to return to the house and turn off the air conditioning. Returning to the house positioned the Hales closer to the chlorine spill and train derailment, and consequently, the Hales allege, exposed them to more concentrated chlorine contamination and poisoning.

Two hours after SWFD was allegedly prevented from initiating the Hales' rescue, the Hales were contacted by private rescuers by telephone. At 8:30 a.m., private rescuers informed the Hales that they were on their way to the Hales' residence from the southeast. Shortly thereafter, the private rescuers again contacted the Hales and informed them that BCSO sheriff's deputies blocked their rescue attempt. Additionally, the Hales' son Charles, who was familiar with the area and had experience as a volunteer firefighter, was also denied the opportunity to make a rescue attempt. Charles called 911 and informed the dispatcher that he could make the rescue; however, he was informed that he would be stopped if he attempted the rescue. After driving to the area, Charles could not get close enough to the house because sheriff's deputies blocked his access.

SAFD committed its HazMat teams to the incident, which began arriving at the command site at 8:30 a.m. and prepared for a tactical entry through the wreckage at approximately 9:45 a.m. to search for victims. At approximately 9:10 a.m., Bexar County 911 staff advised the Hales by telephone to get into the shower for decontamination in preparation for imminent evacuation. The Hales showered, ultimately creating a chemical reaction with the chlorine gas in the

house, producing hydrochloric acid, which allegedly resulted in further harm and injury.

After SWFD's attempts to use its vehicle to make a rescue from the southeast were blocked, Chief Harris requested Lt. Harris and fireman Michael Yanelli find a way around the wreckage from the southeast to rescue the trapped residents. Lt. Harris and Yanelli drove their fire rescue truck along the county roads southwest of the wreck, searching for a way to approach the isolated segment of Nelson Road, upwind of the wreckage, and away from the chemical hot zone. The two rescuers were observed by the operator of BCSO Unit 2701, who contacted dispatch to see if BSCO had authorized any firemen to be on the back side of Nelson Road. BSCO Lt. Kyle Coleman and another deputy of the BSCO stopped Harris and Yanelli, and ordered them out of the area. Appellants allege that while in their clearly marked SWFD rescue vehicle, the two rescuers attempted to identify themselves and explain their actions, but the BSCO deputy ordered them to leave without an opportunity to show any credentials.

According to a partial transcript of BCSO radio communications prepared at the request of the National Transportation and Safety Board, at around 9:45 a.m., the operator of BSCO Unit 2701, Lt. Coleman, was advised about the SWFD presence and authority to check homes and proceed along Nelson Road. The BSCO operator of BSCO Unit 2004, Lt. Raul Fernandez, informed Lt. Coleman that the SWFD Assistant Chief had sent firemen into the back side of Nelson Road to check on some homes, and noted that "it's their call, it's the county side." Both Lt. Coleman and Lt. Fernandez were senior sheriff patrol supervisors in charge of operations at the accident. After being informed of SWFD's presence, Lt. Coleman responded "well, we just ordered them out of here, we've already took care of that, and we're not going to allow 'em back in here . . . until the fire command over there . . . tells us they can come back in." Appellants allege that the deputies were acting pursuant to an official decision

5

to block anyone other than the SAFD HazMat team from approaching the accident scene. The Harrises and Scraper allege that Lt. Coleman, a BCSO sergeant, ordered them to stay out of the area. Similarly, the Hales allege that other private rescuers, such as their son, Charles, were prevented from attempting a rescue.

SAFD finally reached the Hales at 11:30 a.m. The Hales believe they could have been rescued as early as 7:30 a.m. if Lt. Coleman and other deputies had not interfered with SWFD. They allege that, as a result of the delay, they suffered prolonged exposure to chlorine gas and hydrochloric acid. When SAFD arrived, Mary Hale was almost unconscious. Her brother-in-law, who was living with the Hales at the time, died a few months later. Wayne Hale's mother and step-sister, who lived next door, were dead when help arrived.

The Hales assert that their substantive due process rights under the Fourteenth Amendment were violated when Bexar County and its officials failed to allow the SWFD or other volunteer rescuers to attempt a rescue. The Harrises and Scraper contend that their constitutional rights were violated because they were wrongfully prevented from rescuing the Hales and others by Bexar County law enforcement personnel. Defendant Coleman filed a motion to dismiss on the basis that he was entitled to qualified immunity, which was granted by the district court. Bexar County subsequently moved for summary judgment on the claims asserted by Appellants in their third amended complaint. The district court granted Bexar County's motion for summary judgment, holding that Appellants had failed to allege a constitutional violation to support their claims under § 1983. The instant appeal followed.

## II.

This court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007). Summary judgment is proper if

the record reflects "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether a genuine issue of material fact exists, this court must draw all reasonable inferences in favor of the responding party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

In order to properly state a § 1983 claim against Bexar County, Appellants must identify (1) an official policy or custom (2) of the city's policymaker (3) that caused (4) the plaintiff to be subjected to a deprivation of a constitutional right. *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169 (5th Cir. 1987)). A "'proper analysis requires us to separate two different issues when a section 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [municipality] is responsible for that violation.'" *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 426 (5th Cir. 2006) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). A municipality cannot be held liable under § 1983 if there is no underlying constitutional violation. *Id.*

In order to establish the existence of a constitutional violation in this case, the Hales urge that we accept the state-created danger theory and hold Bexar County liable thereunder. This Circuit has never expressly accepted the state-created danger theory that a due process violation can be found if a state created or increased the danger to the plaintiffs and acted with deliberate indifference. *Rios*, 444 F.3d at 422–23 ("[N]either the Supreme Court nor this court has ever either adopted the state-created danger theory or sustained a recovery on the basis thereof. We have, however, many times refused to allow recovery sought to be predicated thereunder."); *see also Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1983 liability"); *Morin v. Moore*, 309 F.3d 316,

321–24 (5th Cir. 2002); *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 313–14 (5th Cir. 2002).

In *Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992), involving a § 1983 suit brought by the estate of a slain hostage against the county sheriff who commanded hostage rescue efforts, we refused to find a constitutional violation on the basis of the state-created danger theory, or otherwise, in the context of a failed rescue effort. In *Salas*, the plaintiff claimed that the county sheriff deprived the victim of her life by preventing city officials from coming to her aid, using incompetent hostage negotiators, and failing to provide adequate equipment to handle the hostage situation. *Salas*, 980 F.2d at 303. After determining that the plaintiff had not alleged a constitutional violation, this court found that the sheriff was entitled to qualified immunity from suit. *Id*.

In considering the claim in *Salas*, we recognized that some other Circuits had found "a denial of due process when the state creates the . . . dangers" faced by an individual. *Id*. at 309. We also noted a Seventh Circuit case which held that a drowning victim had stated a claim under the due process clause when a deputy acting pursuant to county policy committed a constitutional tort by "cutting off private avenues of life saving rescue without providing an alternative." *Id*. at 308 (citing *Ross v. United States*, 910 F.2d 1422, 1433 (7th Cir. 1990)). After considering these potential theories, we held that the plaintiff had not alleged a constitutional violation, because despite the fact that the sheriff dismissed the city police officers who were attempting to aid the victim, the sheriff's deputies were at the same time securing the courthouse and commencing negotiations with the hostage-taker. *Salas*, 980 F.2d at 308. We held that the facts presented in *Salas* were unlike the situation in *Ross* because the sheriff had provided a "meaningful alternative" to the rescue efforts that were prevented. *Id*. ("[I]n *Ross*, no effort was made to rescue a drowning boy for thirty minutes. In contrast, at the time Carpenter dismissed the police his deputies were present and negotiating with

8

Cabano. Carpenter did not use his authority as a state officer to prevent any rescue, rather he exercised his authority to replace one rescue effort with another.").

In addition, we noted that a state's failure to protect a person can amount to a constitutional violation only if the state had a duty to act. *Id.* at 308–09 (citing *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189 (1989)). After noting that some settings create a special relationship between the state and a person—i.e., the person is held in state custody or otherwise prevented by the state from caring for herself—imposing a duty to protect the person, this court in *Salas* noted that a failed rescue effort did not present that type of circumstance. *Id.* The court further stated that even if this Circuit accepted the law of other Circuits which have found constitutional violations when the state created the danger, the sheriff had continued at all times to supervise a law enforcement effort to secure the victim's safe release, and thus the situation did not qualify as a state-created danger because the official did not "fail[] to take any action to alleviate the danger which they created or aggravated." *Id.* at 309.

Like those in *Salas*, the Hales' claims do not allege a constitutional violation for the purposes of § 1983. Even assuming that the prevention of all rescues without providing an alternative presents a valid due process claim in this Circuit, those are not the circumstances presented here. Although Appellants have presented evidence that Coleman prevented the SWFD volunteer firefighters from entering the area, he did provide for the eventual rescue of the Hales by the SAFD. Because Bexar County and Coleman provided a meaningful (though delayed) rescue alternative to the prevented private rescue effort, his actions did not violate the Hales' due process rights. Furthermore, Bexar County can only be held liable if the Hales have asserted that its officials had a duty to act. We have held that preventing a rescue effort does not, in and of itself, create a special

relationship between the state and a person imposing a duty to protect the person. *Salas*, 980 F.2d at 308.

Even if the state-created danger theory was explicitly recognized in this Circuit, it would not apply here for the same reasons expressed in *Salas*. In *Salas*, this court held that the defendant sheriff could not be held liable under the theory because he neither created the immediate risk of danger to the hostage nor did he abandon the victim in the face of the danger presented. 980 F.2d at 309. Certainly Lt. Coleman did not create the immediate danger of the chlorine gas coming from the derailed train. Even if the rule encompassed a claim based upon the increase of a "person's vulnerability to private violence by interfer[ence] with protective services which otherwise would be available," *Salas*, 980 F.2d at 308 (citing *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir.1990)), it would not apply here. Although Coleman excluded the volunteer firefighters, the SAFD—the firefighters Coleman thought were authorized to attempt the rescue—did eventually rescue the Hales and thus he cannot be characterized as "failing to take any action to alleviate the danger." *Id*. at. 309. Because there is no applicable precedent to support the existence of the violation of a constitutional right under these circumstances, the district court did not err in granting summary judgment on the Hales' § 1983 claims.[1]

The Harrises and Scraper, members of the SWFD who attempted to rescue the Hales, also assert that the district court erred in granting summary judgment in favor of Bexar County on the grounds that they failed to assert a constitutional violation or deprivation to sustain their claims under § 1983. The Harrises and Scraper assert that their rights under both the Fourteenth and First amendments

---

[1] Because the Hales have failed to allege a constitutional violation, we need not address the issue of whether they properly alleged that Bexar County had an official policy which was the moving force behind any such violation. *See Rios*, 444 F.3d at 426.

were violated when they were prevented by Bexar County officials from rescuing the Hales.[2]

As our sister Circuits have observed, there is no constitutionally cognizable interest in a volunteer position. *See Versarge v. Township of Clinton N.J.*, 984 F.2d 1359, 1370 (3d. Cir. 1993) (holding that volunteer firefighter had no due process interest in his position despite the fact that he received benefits); *Hyland v. Wonder*, 972 F.2d 1129, 1140–42 (9th Cir. 1992) (holding that the litigant had no protected property interest in or legal entitlement to his volunteer position). Although those cases involved litigants who were terminated from their positions, and not those who were prevented from performing in their volunteer capacity, they support the conclusion that the Harrises and Scraper do not have a due process right to serve as volunteer firefighters.

The Harrises and Scraper also allege that they suffered an equal protection violation when they were denied access to the Hales. Because the SWFD are not members of a protected class, any equal protection violation is evaluated under the rational basis standard.[3] *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 753 (5th Cir. 1988) ("Since this case does not concern a suspect or quasi-suspect classification such as race or sex to which heightened scrutiny is given, the equal protection clause requires only a minimum degree of rationality."). An equal protection violation does not arise if there is any basis for a classification or official action that bears a debatably rational relationship to a conceivably legitimate governmental end. *Id.*; *see also Stefanoff v. Hays County, Tex.*, 54 F.3d 523, 526 (5th Cir. 1998) ("[E]qual protection rights are not violated as long as the policy is

---

[2] Although Appellants mention the First Amendment in their brief, they do not provide any arguments concerning a First Amendment violation or cite any authorities to support such an argument. Accordingly, this argument has been waived. *See United States v. Edwards*, 303 F.3d 606, 647 (5th Cir. 2002) (inadequately briefed arguments are waived).

[3] Appellants do not assert in their brief, nor did they assert at trial, that they are part of a suspect class.

rationally related to some legitimate governmental goal."). Although neither party addressed the issue of whether Coleman or Bexar County had a rational basis for excluding the volunteer SWFD firefighters while allowing the professional SAFD firefighters to enter, it is evident that under the circumstances presented here, excluding volunteers, however highly trained, in a dangerous emergency situation is a conceivably legitimate government goal.

## III.

Because Appellants failed to allege a violation or deprivation of their constitutional rights, the judgment of the district court is AFFIRMED.