**Christina SWANN, Plaintiff,**

v.

**CITY OF DALLAS, Urban Rehabilitation Standards Board, Aquila Allen, Vitale Rivera, Darwin Gaines, Helen Swint, Victor Bonilla, Georgeann Owen, Charles Smith, Ramiro Lopez, Leila Thompson, Defendants.**

Civil A. No. 3–95–CV–0033–BC.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 12, 1996.

Liza Farrow–Gillespie, Law Office of Liza Farrow–Gillespie, Dallas, TX, for Christina Swann.

Christina Swann, Dallas, TX, pro se.

Walter C. Davis, III, Mark Robert Benavides, Dallas City Attorney's Office, Dallas, TX, for City of Dallas, A.C. Gonzalez, Elizabeth Fernandez, John Does, 1–10, Jane Does, 1–10, Urban Rehabilitation Standards Board of City of Dallas, Aquila Allen, Vitale Rivera, Darwin Gaines, Helen Swint, Victor Bonilla, Georgeann Owen, Charles Smith, Joe Burkleo, Ramiro Lopez, Leila Thompson, Gavino Sotello.

Louis J. Weber, Melton Weber Whaley Letteer & Mock, Dallas, TX, pro se.

## MEMORANDUM OPINION AND ORDER

BOYLE, United States Magistrate Judge.

Before the Court are **Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment,** filed July 7, 1994 and July 21, 1995, respectively. For the reasons that follow, the court **ORDERS** that Plaintiff's Motion for Partial Summary Judgment be **GRANTED** in part and **DENIED** in part, and **Defendants' Motion for Summary Judgment** be **GRANTED** in part and **DENIED** in part, as set forth below.

### I. Factual and Procedural Background [1]

Plaintiff Christina Swann ("Swann"), is the owner of an eight-unit apartment building located at 917 N. Haskell Street, Dallas, Texas. Her struggles with the City of Dallas over the condition of this building underlie the present action. The details of Swann's interactions with the City regarding her property provide a helpful starting point for this summary judgment analysis.

Since May 1991, Swann's apartment building has been the subject of some scrutiny by the City of Dallas' Urban Rehabilitation Standards Board ("URSB"). After hearings in December, 1991, and September, 1992, Swann was ordered by the URSB to make certain repairs to her building to meet Dallas City Code standards. On August 2, 1994, believing Swann had failed to meet her obligation, the URSB held its third hearing regarding the state of her property, determined it an urban nuisance, and ordered it vacated and demolished. Swann claims she was not notified of this "demolition hearing" and only learned of the proceeding thirty minutes prior to its commencement. Swann contends she attended the hearing and informed the URSB that she had not received notice of the hearing; nevertheless, the URSB continued the hearing and ordered the demolition.

Thereafter, City Code Enforcement Officers, ostensibly carrying out the URSB's order, in December and January, 1994 inspected the building and placed red placards on each unit stating that the structure was hazardous and occupancy prohibited. The building was also "secured" or boarded up by the code officers. Swann, undaunted, resisted the City's efforts, at every turn, by removing the boards and placards and continuing to maintain rent-paying tenants. After code officers' third inspection and securing of the building on January 6, 1995, Swann filed the instant suit charging the City and certain individuals with violating her civil and constitutional rights.

---

1. When possible, the Court has utilized the facts upon which the parties agree in their motions for summary judgment. Otherwise, the Court has indicated which of the assertions are claimed by the party to be true.

In her First Amended Complaint she alleges that the City of Dallas, the URSB [2] and several City officials,[3] named below, violated her federal civil rights under Title 42 U.S.C. § 1983 and the U.S. Constitution, conspired to violate her civil rights in violation of 42 U.S.C. § 1985 and deprived her of her property without due process of law. She also claims that the defendants are liable under several Texas state law causes of action, including defamation, negligence, gross negligence and trespass.

Shortly after the suit was filed, both Swann and the defendants filed motions for injunctive relief; the defendants seeking to halt Swann's interference with their efforts to close her building and Swann moving to regain her property. After a hearing on March 8, 1995,[4] the defendants' motion was denied. Swann's motion was held in abeyance pending appointment of counsel. On June 14, 1995, a hearing was held on Swann's motion after which this court recommended to the district court that her motion be granted. This recommendation was based, in part, upon a finding that Swann had established a likelihood of prevailing on the merits given the city's failure to notify her of the demolition hearing.[5] On November, 9, 1995, the district court transferred the case to this court, on consent of the parties pursuant to 28 U.S.C. § 636(c).

Both sides now move for summary judgment. By her motion, plaintiff claims to be entitled to summary judgment against the City, the URSB and its members, and Allen for violations of § 1983. Defendants, on the other hand, seek judgment as a matter of law in their motion claiming that Allen, Gaines, Swint, Bonilla, Owen, and Smith are entitled to absolute immunity from personal liability.

Further, defendants claim that Allen, Gaines, Swint, Bonilla, Owen, Smith, Lopez, Rivera, and Thompson are shielded from personal liability by the doctrine of qualified immunity. In their motion, defendants also argue that Swann has not been injured by a custom or policy of the City and thus the defendants claim they are entitled to judgment as a matter of law. Finally, defendants contend that they cannot conspire within the meaning of § 1985.

Because summary judgment principles guide this analysis, it is to those standards which the court turns first.

### II. Summary Judgment Standards

 Summary judgment is appropriate when the pleadings and the evidence show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Crescent Towing & Salvage Co. v. M/V Anax*, 40 F.3d 741 (5th Cir.1995). The applicable substantive law identifies those facts that are material. *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir.1991), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and only disputes about those facts will preclude the granting of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. There is a genuine issue of material fact if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Society of Fin. Examiners v. Nat'l. Assn. of Certified Fraud Examiners, Inc.*, 41 F.3d 223, 226 (5th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995), *citing Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990).

2. The URSB was created pursuant to chapter 27 of the Revised Code of Civil and Criminal Ordinances of the City of Dallas (the "City Code") and Texas Local Government Code § 214. The URSB determines whether a property meets the minimum standards as defined by chapter 27 and, if not, the appropriate measure to remedy the substandard property.

3. Defendant Aquila Allen ("Allen") is the administrator of the URSB. Darwin Gaines ("Gaines"), Helen Swint ("Swint"), Victor Bonilla ("Bonilla"), Georgeann Owen ("Owen") and Charles Smith ("Smith") are members of the URSB. Ramiro Lopez ("Lopez") is the Division Manager for Streets and Sanitation, Code Enforcement Services of the City of Dallas. Vitale Rivera ("Rivera") and Leila Thompson ("Thompson") are Code Enforcement Inspectors.

4. The March 8, 1995 injunction hearing will be referred to as "Inj. Hrg.–1". The June 14, 1995, injunction hearing will be referred to as "Inj. Hrg.–2".

5. See Findings filed September 29, 1995.

■ The moving party bears the initial burden of showing that there is no genuine issue for trial. *Nat'l. Ass'n. of Gov't. Employees v. City Public Service Board of San Antonio, Texas,* 40 F.3d 698, 712 (5th Cir. 1994). Once a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party to set forth specific facts showing that there was a genuine issue for trial. *Elliott v. Lynn,* 38 F.3d 188, 190 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1976, 131 L.Ed.2d 865 (1995), *citing Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. This burden is not satisfied with "some metaphysical doubt as to the material facts," (*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)), by "conclusory allegations" (*Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)), by "unsubstantiated assertions", (*Hopper v. Frank,* 16 F.3d 92 (5th Cir.1994)), or by only a "scintilla" of evidence. *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir.1994). The court must consider all evidence in the light most favorable to the non-moving party and resolve reasonable inferences in favor of the non-moving party. *Society of Fin. Examiners,* 41 F.3d at 226, *citing Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Having reviewed the applicable law, the Court now turns to the motions at hand. Defendants' motion, because it involves the greater number of issues, will be taken up first. However, there is some overlap between the motions as to the City's and Allen's liability. To avoid confusion, those issues will be addressed in the first portion of this opinion relating to the defendants' motion.

### III. Defendants' Motion for Summary Judgment

Prior to deciding if the defendants are liable or not as a matter of law, it must be determined if they are subject to suit in the first instance.

### A. Immunity Standards

■ Defendants Allen, Gaines, Swint, Bonilla, Owen, and Smith are being sued in both their individual and official capacities. A suit against a person in his official capacity is treated as a suit against the governmental entity of which the official is an agent. *Kentucky,* 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 122. In order to establish personal liability of a defendant under § 1983, a plaintiff must show that the official acted under color of state law and deprived an individual of a federal right. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 122 (1985). To defend against a suit on personal liability grounds, a defendant may assert the defense of absolute or qualified immunity. *Id.* Immunity is a threshold issue which, if applicable to the case, acts as a bar to a court's ability to hear the plaintiff's claim. *Sutton v. United States,* 819 F.2d 1289, 1299 (5th Cir.1987). Absolute immunity protects certain officials from personal liability even when his exercise of authority was "flawed by the commission of grave procedural errors," or when his decision was motivated by prejudice, bias, or greed. *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331, 341 (1978); *Sparks v. Duval County Ranch Co.,* 604 F.2d 976, 978 (5th Cir.1979), *cert. denied,* 445 U.S. 943, 100 S.Ct. 1339, 63 L.Ed.2d 777 (1980). Qualified immunity, on the other hand, shields individuals from personal liability only if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984).

### B. Absolute Immunity

Defendants Allen, Gaines, Swint, Bonilla, Owen and Smith claim that they are absolutely immune from personal liability as a matter of law. Gaines, Swint, Bonilla, Owen, and Smith claim since the URSB functions as a judicial body, the URSB members are protected by absolute immunity. Similarly, Allen likens her responsibility of initiating proceedings before the URSB to the role of a prosecutor in a criminal proceeding; thus, she also claims absolute immunity from liability for actions performed in this official capacity.

■ It is clear that judges are absolutely immune from personal liability for judicial acts which are not exercised in clear absence of jurisdiction. *Johnson v. Kegans,* 870 F.2d 992, 995 (5th Cir.1989), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989). Courts have extended absolute immunity to "quasi-judicial" officials whose duties are "functionally comparable" to those of a judge. *Butz v. Economou,* 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978); *Johnson,* 870 F.2d at 995–96. For example, absolute immunity has been granted to federal hearing examiners and administrative law judges (*Butz,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895); the National Association of Securities Dealers and its disciplinary officers (*Austin Mun. Securities, Inc. v. Nat'l Ass'n of Securities Dealers,* 757 F.2d 676 (5th Cir.1985)); members of pardon and parole boards (*Cruz v. Skelton,* 502 F.2d 1101 (5th Cir.1974)); Texas Civil Service Commissioners (*Mylett v. Mullican,* 992 F.2d 1347 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993)); members of State Board of Healing Arts (*Kutilek v. Gannon,* 766 F.Supp. 967 (D.Kan.1991)); Personnel Hearing Officers (*Saavedra v. City of Albuquerque,* 859 F.Supp. 526 (D.N.M. 1994)); and zoning board members (*Jodeco, Inc. v. Hann,* 674 F.Supp. 488 (D.N.J.1987)).

Prosecutors have been granted absolute immunity for initiating prosecutions and other acts associated with the judicial process. *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). Absolute immunity has also been extended to officials who function as prosecutors at administrative hearings, (*Butz,* 438 U.S. at 516, 98 S.Ct. at 2916), to probation officers who prepare pre-sentence reports, (*Freeze v. Griffith,* 849 F.2d 172 (5th Cir.1988)), and to parole board employees who give information to the Texas Board of Pardons and Parole, (*Johnson,* 870 F.2d at 998).

■ The official who seeks absolute immunity has the burden of showing that public policy justifies the extension of the doctrine of judicial immunity. *Butz,* 438 U.S. at 506–507, 98 S.Ct. at 2910–2911. The Supreme Court has warned that absolute immunity is "strong medicine, justified only when

the danger of officials' being deflected from the effective performance of their duties is very great." *Forrester v. White,* 484 U.S. 219, 230, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988). Furthermore, the official's ability to claim qualified immunity may dissuade a court from unnecessarily extending the doctrine of absolute immunity. *Forrester,* 484 U.S. at 224, 108 S.Ct. at 542.

■ To assess whether absolute immunity should be extended, a court must examine the character of the officer's duties and his relationship to the parties. *Stump,* 435 U.S. at 359, 98 S.Ct. at 1106, 55 L.Ed.2d at 341. The court must first determine whether the individual's duties are judicial in nature and then weigh the costs and benefits of extending absolute immunity to the officials. *Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985). In this analysis, the following factors are relevant:

(a) the need to assure that the individual can perform his functions without harassment or intimidation;

(b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;

(c) insulation from political influence;

(d) the importance of precedent;

(e) the adversarial nature of the process;

(f) the correctability of the error on appeal.

*Id.,* citing *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913.

### 1. The URSB Members

■ The URSB's functions are judicial in nature and its members' role is comparable to that of a judge. For example, the URSB may adopt procedural rules, so long as they are not inconsistent with the City Code. DALLAS, TEX., REV.CITY CODE ch. 27, art. II, § 27–9(a). The chairman of the URSB may administer oaths and compel the attendance of witnesses. *Id.* at § 27–9(b). At URSB's hearings, the owners, lessors, occupants, and lienholders may testify or present witnesses; these parties are also entitled to cross-examine any witness who testifies against him or

her. *Id.* at § 27–9(c). The URSB makes findings of fact regarding whether a structure is an urban nuisance. *Id.* at § 27–13(c)(1), (4). The URSB is empowered to grant various remedies to structures found to be substandard, including the power to assess a civil fine for failure to follow the URSB's order. *Id.* at § 27–8(8). Further, failure to comply with the URSB's order is a criminal offense. *Id.* at § 27–9(c) § 27–4. Moreover, the determinations regarding substandard structures now made by municipal boards, such as the URSB, were once decided by the judiciary. *Traylor v. City of Amarillo*, 492 F.2d 1156, 1158 (5th Cir.1974). Thus, the court finds that the roles of the URSB members are judicial in nature.

■ Next, the Court must balance the equities of extending absolute immunity to these individuals in accordance with the *Butz* factors. First, it is imperative that URSB members be allowed to perform their duties free from the threat of personal liability in a lawsuit. The URSB is empowered to order individuals to repair or demolish a structure, to assess civil fines, to relocate occupants, and to seek receivership of properties. DALLAS, TEX., REV.CITY CODE ch. 27, art. II, § 27–8(a)(2–3), (8), (10). Thus, like judges, URSB members make controversial decisions which may negatively affect an individual's residence, livelihood, or financial status. *See Forrester*, 484 U.S. at 224, 108 S.Ct. at 542. (emphasizing that judges frequently disappoint some of the most intense and ungovernable desires that people can have). For this reason, it is important that the URSB make these important decisions free from the threat of incurring personal liability for every order issued by the board.

Moreover, the City Code requires the city council to appoint thirty Dallas residents as members of the URSB. DALLAS, TEX., REV. CITY CODE ch. 27, art. II, § 27–6(a). The board must consist of an architect, mortgage loan banker, home builder, licensed real estate broker, social or welfare worker and structural engineer who have at least ten years experience in his or her field; the remaining members are chosen on the basis of their interest in the community. *Id.* at § 27–6(a)(1–8). Without the assurance of

protection from personal liability, these individuals will be deterred from serving on the URSB. *See Wood v. Strickland*, 420 U.S. 308, 320, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975) (noting that private liability deters individuals from seeking such offices); *Jodeco v. Hann*, 674 F.Supp. 488, 498 (D.N.J. 1987) (granting absolute immunity to zoning board members to prevent deterrent effect).

Second, there are adequate safeguards to control unconstitutional conduct. The City Code requires the URSB to notify the owner, lessor, occupant of the structure, mortgagee and lienholder of the property which is the subject of a hearing. DALLAS, TEX., REV.CITY CODE ch. 27, art. II, § 27–13(a). The hearing is public, thus all interested parties can attend and present evidence. *Id.* at art. IV § 27–13(b). Upon request, the URSB can set a rehearing of its prior determination after notice is given and the proceedings are stayed. *Id.* at § 27–14(a), (b). Additionally, the City Code provides that a party who is affected by an order of URSB may appeal the decision to a state district court. *Id.* at § 27–9(e). These safeguards reduce the need for an aggrieved party to file a private damage action to control unconstitutional conduct.

Swann claims that appeal to a state district court is insufficient to correct any error of the URSB. She contends that because the URSB's orders are to be analyzed under a substantial evidence standard, constitutional errors cannot be remedied and thus, plaintiffs will be forced to file private lawsuits. *Id.*; TEX.LOCAL GOV'T CODE ANN. 214.0012(f). However, under Texas law, a district court is allowed under a substantial evidence standard to review the decision of an agency for fraud, bad faith, and abuse of discretion and to determine whether the agency's proceedings afforded due process of law. *Central Educ. Agency v. Upshur County Comm'rs Court*, 731 S.W.2d 559, 562 (Tex.1987). Thus, the Court finds sufficient safeguards to prevent unconstitutional conduct and an adequate ability to appeal should such conduct occur.

Third, as previously discussed, URSB members are appointed by the City Council and are therefore, to some extent, shielded

from the political processes. Moreover, the URSB is a "neutral and detached hearing body." *See Cleavinger,* 474 U.S. at 204, 106 S.Ct. at 502, 88 L.Ed.2d 507 (1985). *Cleavinger* held that a prison disciplinary committee was not entitled to absolute immunity. However, unlike the members of a prison disciplinary committee, who were employees of the prison and under pressure to resolve disputes in favor of the institution, the URSB members are independent and not inherently biased toward one particular party in a dispute. *Id.*

Fourth, although legal precedent does not bind the URSB's decisions as it does those of the judiciary, the City Code sets specific minimum standards by which to judge the condition of a structure. DALLAS, TEX., REV. CITY CODE ch. 27, art. II, § 27–11. For example, only edifices found by the URSB to present a danger or, because of violations of the City Code, to cause potential injury, damage, harm or inconvenience to the community may be deemed "urban nuisances". *Id.* at art. I, § 27–3(23). Thus, although not governed by case law, the local ordinance assures that the URSB's decisions are consistent and fair. *See Traylor, supra.* 492 F.2d at 1159–60.

Last, affected parties have a right to cross-examine witnesses who testify at the URSB's hearings. *Id.* at art. II, § 27–9(c). Thus, the URSB's proceedings are potentially adversarial in nature. Considering these factors, the Court finds that the benefits of extending absolute immunity to members of the URSB far outweigh the costs.

Swann argues that because the URSB did not act in accordance with the procedures dictated by the City Code, it lacked jurisdiction to hold the August 2, 1994 hearing. As a result, she claims that URSB members do not qualify for absolute immunity. *See Forrester v. White,* 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988) **(holding absolute immunity protect judicial officers for actions performed within their jurisdiction).**

■ The Court does not find this argument persuasive. The City code creates the URSB and endows it with certain powers and duties. DALLAS, TEX., REV.CITY CODE ch. 27, art. II, §§ 27–6, 27–8. The failure of the URSB to provide an owner notice of the hearing, does not deprive them of their jurisdiction to conduct a hearing.[6] *See Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331, 341 (1978). Rather, "the term 'jurisdiction' is to be broadly construed to effectuate the policies of guaranteeing a disinterested and independent judicial decision-making process." *Holloway v. Walker,* 765 F.2d 517, 523 (5th Cir.1985) citing *Stump,* 435 U.S. at 356–57, 98 S.Ct. at 1105. In *Holloway,* the court, in holding the judge cloaked with absolute immunity, found it significant that he was generally empowered by statute to conduct the type of proceedings for which he was under fire and that there was no statute or case law prohibiting him from considering the type of petition at issue in the case. Likewise the URSB is empowered to conduct the hearing now challenged by Swann. Thus, the Court finds that defendants Gaines, Swint, Bonilla, Owen, and Smith, the members of the URSB, are entitled to absolute immunity from personal liability in this action.

### 2. The URSB Administrator

■ Although courts have extended absolute immunity to "quasi-prosecutors,"[7] the Court finds that Allen has failed to meet her burden of proving that, as a matter of law, she is entitled to such protection. Allen is "Administrator for the URSB." Def.s' Mot. for Summary Judgment, Aff. of Aquila Allen at 1. And as will be set forth later, her responsibilities are broad. However, the City Code neither creates this position, nor defines the duties or powers of the administrator. The defendants contend that Allen initiates proceedings before the URSB. However, there is no evidence in the record, however, to substantiate this assertion. Moreover, Allen in her testimony at the first

---

**6.** While the URSB retained jurisdiction to conduct the hearing, this fact does not impact the issue of whether the hearing was conducted in violation of Swann's due process rights.

**7.** *See* supra at 1193.

injunction hearing failed to recite this as one of her duties. Inj. Hrg–1 at 61. In short, the defendants have failed to meet their burden under *Butz* of establishing Allen's entitlement to absolute immunity as a "quasi-prosecutor". And the defendants provide no authority to support their position that Allen's specific position is akin to that of a prosecutor. Therefore, the Court finds that Allen is not entitled to absolute immunity.

## C. Qualified Immunity

▮▮▮▮▮ Defendants Allen, Rivera, Lopez, and Thompson claim they are protected from personal liability under the doctrine of qualified immunity. Qualified immunity protects public officials acting within the scope of their official duties from civil liability. *Eugene v. Alief Independent School Dist.*, 65 F.3d 1299, 1305 (5th Cir.1995) citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–38, 73 L.Ed.2d 396 (1982). Public officials, however, are not shielded by qualified immunity if their conduct violates clearly-established constitutional rights, if a reasonable person would have known that such conduct was unconstitutional. *Id.* at 1305 citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The determination of whether an official is entitled to qualified immunity involves a three-pronged [8] analysis. *Eugene*, 65 F.3d at 1305 citing *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); See also *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276–78 (5th Cir. 1992).

To satisfy this three-part test, it must first be determined whether a plaintiff has stated a violation of a constitutional right. *Siegert*, 500 U.S. at 232, 111 S.Ct. at 1793. If the plaintiff has in fact asserted a violation of a constitutional right, she must, as the next step show that this constitutional right was clearly established at the time of the actions underlying the lawsuit. *Id.* at 233–34, 111 S.Ct. at 1794. Finally, to satisfy the third part of the qualified immunity test, the plaintiff must establish that the official's conduct was objectively unreasonable in light of the legal rules clearly established at the time the actions were taken. *Eugene*, 65 F.3d at 1305 citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. With these rules in mind, the Court now turns to the claims of qualified immunity in the instant case. Because the basis for Allen's claim of qualified immunity differs from that of Lopez, Rivera and Thompson, her claim is taken up first, below.

## 1. Defendant Allen

### a. Violation of a Constitutional Right

▮▮▮ The Supreme Court in *Siegert* instructs a court undertaking a qualified immunity analysis to first determine if the plaintiff has alleged a violation of a right secured under the United States Constitution. Swann alleges that she was denied due process in violation of the Fifth and Fourteenth Amendments when the URSB failed to notify her of the demolition hearing and thereafter evacuated her tenants, and closed and boarded up her building. This court finds that she has crossed this first threshold of stating a constitutional claim. The Fifth Amendment provides in pertinent part: "No person shall ... be deprived of life, liberty, or property without due process of law." The Due Process Clause of the Fourteenth Amendment provides, in turn, that no state shall "deprive a person of life, liberty, or property without due process of law." To trigger these constitutional provisions Swann must have a protectible property interest at stake. *Price v. City of Junction, Texas*, 711 F.2d 582, 589 (5th Cir.1983). It does not appear to be disputed, nor could it be, that Swann's ownership of the apartment building and land are protected by the Fourteenth Amendment's due process clause. See *Small Engine Shop, Inc. v. Cascio*, 878 F.2d 883, 887 (5th Cir. 1989).[9] This is true regardless of whether

---

**8.** Although the Supreme court in *Siegert* held that a court deciding a claim of qualified immunity must first determine if the plaintiff has stated a constitutional claim and then move to the familiar two-pronged test, some courts have continued to refer to a two-part test as the correct analysis. See *Vera v. Tue*, 73 F.3d 604, 606–07 (5th Cir.

1996). see also Kathryn R. Urbonya, *Qualified Immunity From Damages*, 531 Prac.Law Inst. 235 at 12 (1995).

**9.** There is much contention regarding the URSB's belief as to Swann's legal ownership at the time of the demolition hearing, however, this

Swann owns this land free and clear or is paying on a mortgage; a "mortgagor" under Texas law.[10]

Having determined that Swann's apartment building constitutes a protected property interest does not end the inquiry as to whether she has stated a constitutional claim. It must next be decided whether her contention that she received no notice of the demolition hearing completes her obligation under this first step of the qualified immunity analysis.

■■■ Despite the "cryptic and abstract words of the due process clause" at a minimum, they can be said to "require that deprivation of life, liberty or property by adjudication must be preceded by notice and an opportunity for hearing appropriate to the nature of the case." *Small Engine*, 878 F.2d at 887, citing *Mullane v. Central Hanover Bank & Trust, Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). The United States Supreme Court set forth the constitutional rule of notice in *Mullane:*

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Miles v. District of Columbia*, 510 F.2d 188, 192 (D.C.Cir.1975), citing *Mullane.*

"Though the required procedures may vary according to the interests at stake in particular context, *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), '[t]he fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." ' " *Cuellar v. Texas Employment*

*Commission*, 825 F.2d 930, 934 (5th Cir.1987) citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (other citations omitted).

In view of the above authority, Swann's contention that she owned the targeted property and received no notice of the demolition hearing satisfies the first prong of the qualified immunity analysis.

*b. Clearly Established Constitutional Right*

■■■ Turning to part-two of the three-part test, the Court must now decide if the constitutional right alleged by Swann was clearly established at the time of the demolition hearing. A constitutional right is clearly established only when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Salas v. Carpenter*, 980 F.2d 299, 310 (5th Cir.1992) citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1982). In other words, it must be determined that Swann's right to notice prior to a hearing ordering the demolition of her property was clearly established in a particularized, fact-specific sense so that reasonable officials would understand that not giving her notice and an opportunity to be heard is violation of that right. See *McGregor v. Louisiana State Univ. Bd. of Sup'rs.*, 3 F.3d 850, 862 (5th Cir.1993). (other citations omitted). Succinctly stated, "officials must observe 'general, well-developed legal principles' ". *Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 455 (5th Cir. 1994) citing *Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 (5th Cir.1987)

■■■ That a property owner has a clearly established due process right to notice and a

does not affect this analysis of whether she has stated a constitutional claim, rather, this issue will be taken up in assessing the objective legal reasonableness of Allen's actions.

10. The due process clause extends to property rights less substantial than full legal title. *FDIC v. Morrison*, 747 F.2d 610, 613 (5th Cir.1984). Property rights are created not by the U.S. Constitution, rather are " 'defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that

support claims of entitlement to those benefit' ". *Id.*, at 613. (other citations omitted). Texas law recognizes property interests in "mortgagors" such as Swann. See Kenneth M. Krock, Comment, *The Constitutionality of Texas Nonjudicial Foreclosure: Protecting Subordinate Property Interests From Deprivation Without Notice*, 32 Hous.L.Rev. 815, 822, n. 48, 825 n. 72 (1995). Although the various states differ in their terminology, Texas refers to an individual paying on a mortgage as a "mortgagor" and the holder of the mortgage as "mortgagee". *Id.*

meaningful opportunity to be heard prior to a hearing ordering the property's demolition cannot be seriously disputed. Since the constitutional rule of notice was first stated in *Mullane,* supra., the United States Supreme Court and all of the Circuit Courts, including the Fifth, have repeatedly applied this fundamental principle of due process in a variety of contexts.

In *Small Engine Shop,* the Fifth Circuit reiterated the *Mullane* due process principles stating,

> *Mullane* remains our trusted guide. "*Mullane* ... established that state action affecting property must generally be accompanied by notification of that action: 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 108 S.Ct. 1340, 1344, 99 L.Ed.2d 565 (1988). "In the years since *Mullane, the court has adhered to these principles, balancing the 'interest of the State'* and the 'individual interest sought to be protected by the Fourteenth Amendment.' *Ibid.* ..." *Small Engine Shop,* 878 F.2d at 887 citing *Tulsa Professional Collection Services,* 485 U.S. at 484, 108 S.Ct. at 1344.

These same well-settled principles were set forth at length by the Fifth Circuit in *Cuellar,* supra, where the court in reviewing the dictates for procedural due process in administrative hearings regarding deprivation of property stated,

> '[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); see also *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). Depending on the circumstances, and the interests at stake, a fairly extensive evi-

dentiary hearing may be constitutionally required before a legitimate claim of entitlement may be terminated. See *Goldberg v. Kelly,* 397 U.S. 254, 266–271, 90 S.Ct. 1011, 1019–22, 25 L.Ed.2d 287 (1970).... In other instances, however, the court has upheld procedures affording less than a full evidentiary hearing if " 'some kind of a hearing' " insuring an effective 'initial check against mistaken decisions' is provided before the deprivation occurs and a prompt opportunity for complete administrative and judicial review is available. [*Cleveland Board of Education v.*] *Loudermill, supra,* 470 U.S. [532] at 542, 545, 105 S.Ct. [1487] at 1493, 1495 [84 L.Ed.2d 494 (1985) ] ... *Cuellar,* 825 F.2d at 934.

These due process principles of notice have been applied to condemnation proceedings. *Miles,* 510 F.2d at 192 n. 2 citing *Schroeder v. City of New York,* 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962); See also *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 797, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).

It is undisputed in this case that Swann was not sent notice of the demolition hearing. Allen has stated that the demolition notice was publicized in the City's newspaper; however, concedes that that is the only notice provided Swann in this case. Inj.Hrg.–2 at 165–66. The defendants cite no clearly established precedent that this type of notice by publication was reasonable under the circumstances. To the contrary, in *Mennonite, supra,* the Supreme Court set forth its unwavering adherence to the principle that notice of condemnation proceedings by publication is inadequate when the landowner's name is known to the city and on the official records. See *Mennonite,* 462 U.S. at 796, 797, 103 S.Ct. at 2710, 2710–11.

Given the abundance of case law on the due process requirements for notice and a meaningful opportunity to be heard prior to a property deprivation, Allen cannot be heard to argue that Swann's rights in this area were not clearly established. We move then, to prong three.

*c. Objective Reasonableness*

Having determined that Swann has stated a constitutional right clearly established at the time of the events underlying her action, the Court now turns to the third part of the three-prong qualified immunity test and that is determining whether Allen's actions were objectively unreasonable. *Eugene,* 65 F.3d at 1305 citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The determination of objective reasonableness is generally a question of law for the court. *Mangieri v. Clifton,* 29 F.3d 1012, 1015 (5th Cir.1994) citing *Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir.1993). Objective reasonableness is assessed in light of legal rules clearly established at the time of the incident. *Mangieri,* 29 F.3d at 1016 (other citations omitted). Determining objective reasonableness of conduct often requires an examination of the information possessed by the official at the time of the challenged action. *Salas,* 980 F.2d at 311 citing *Creighton,* 483 U.S. at 641, 107 S.Ct. at 3040. However, the subjective beliefs of the official are irrelevant to the determination of objective reasonableness. *Mangieri,* 29 F.3d at 1017 citing *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040. For several reasons, based on the undisputed evidence in the record, Allen's actions were objectively unreasonable.

First, it is not in dispute that Swann is the present owner of the property or that she was the owner during the time of the two prior URSB hearings. Inj.Hrg.–1 at 104, Inj.Hrg–2 at 165–66. Nor is it disputed that Swann was not given notice of the August 2, 1994, demolition hearing. Inj.Hrg.–1 at 62, 63, 66, 85; Inj.Hrg.–2 at 175. Allen's contention is that Swann was not given notice because according to the information Allen had available to her at the time of the August 2, 1994, demolition hearing, Swann was not the owner of the property. She states that Swann was required to provide some documentation that she was the owner. Inj. Hrg–2 at 174. Allen refers to a substitute trustee's deed filed August 4, 1992, showing the property "struck off" to Gerlinda Hamil-

ton. Allen Aff., Ex. A, Ex. B., Inj.Hrg.–1 at 63–64. However, reliance on this document was not objectively reasonable under the well-established law or the facts of this case.

The undisputed summary judgment evidence reveals an abundance of information in Allen's possession at the time of the hearing indicating Swann's interest in the property. First, the URSB's file for Swann's property is replete with references to Swann's ownership of the property. Pl's.Mot. for Partial Summ.J.Ex. J, K. Allen testified at the March 19, 1995, injunction hearing, that she was the custodian of this file. Inj.Hrg.–1 at 61. The listed property owners on the URSB file are "Christina Swann/Linda Hamilton." Ex. K. A notation on the URSB file dated August 1, 1994, notes that Swann called the URSB office at 2:11 p.m., indicating that she had not gotten notice of the August 2, 1994, hearing.[11] Ex. K. The file also has a notation dated August 1, 1994, stating "Christina Swann called 'I will shoot anyone who comes on my property.'" Ex. J. In addition to the notations on the URSB file of Swann's ownership, Allen acknowledged at the March, 1995 injunction hearing that it was Swann who was notified as the owner of the property to appear for the December, 1991 and September, 1992 URSB hearings. And it was Swann, not Hamilton, ordered to make the repairs Inj.Hrg.–1 at 63. In fact, Allen testified it was Swann's failure to comply with the two previous URSB orders regarding her property that caused the August 2, 1994, demolition hearing to be set. Inj. Hrg.–2 at 166–67. And it was Hamilton *and* Swann to whom the Notice of Demolition Order was directed. Pl's Mot. for Partial Summ.J., Ex. F.

It is simply not objectively reasonable given Allen's undisputed possession of the above information, that she relied upon the August 4, 1992 title. The deed shows to have been filed August 4, 1992, however, Allen herself concedes that Swann was notified as the owner of the property for the September, 1992 URSB hearing and ordered to make repairs, some one month after this deed was

---

11. Swann states that she heard about the hearing the day before from a tenant. She states that she called the URSB requesting a postponement, but that they never returned her call. Swann Af. at 2.

filed. Inj.Hrg.–1 at 62–63. It is not objectively reasonable that two years later, Allen decided to utilize a title search and rely on a two-year old document she had not previously utilized to determine ownership. This is particularly so in the face of the other information in Allen's possession.

Adding to the unreasonableness of Allen's actions is Swann's summary judgment documentation, not challenged by Allen, which shows her as the owner of record for the *City of Dallas* tax records for the year 1994–95. Pl.'s Mot. for Partial Summ.J.Ex. D. And Gerlinda Hamilton, the putative owner, has submitted an affidavit with plaintiff's summary judgment materials averring that Swann has been the owner of the property for approximately ten years. *Id.* Ex. B. Hamilton's attorney sent the city a letter in December, 1994 supporting this position. *Id.* Allen has not challenged the veracity of this affidavit or letter. Further undermining the reasonableness of Allen's actions is Ms. Hamilton's statement in her affidavit that she never received the notice Allen claims she lawfully sent. Moreover, this Court's findings after the first injunction hearing support Hamilton's statement that the letter sent to her was not mailed before August 1, 1994. **See Findings filed March 29, 1995 at 8; copy of envelope attached to original civil rights claims.**

The clearly established law at the time of the demolition hearing should have put any reasonable official in Allen's position on notice that her actions were unlawful. Even assuming *arguendo* that she reasonably believed that Hamilton was the owner she had a duty under the law to "provide notice reasonably calculated, under all circumstances, to apprise *interested parties* of the pendency of the action and afford them an opportunity to present their objections" *Tulsa*, 485 U.S. at 484, 108 S.Ct. at 1344. And this she did not do. She provides no controverting proof to Hamilton's affidavit that she failed to even notify Hamilton of demolition hearing. Allen's testimony at the first injunction hearing revealed that a "mail log" exists that would support her position, however, this has not been submitted with her summary judgment materials. Inj.Hrg.–1, at 83–4.

Allen concedes that Swann came to the August 2, 1994 hearing claiming ownership of the property. Inj.Hrg.–2 at 175. Swann's vehement protestations at the URSB's demolition hearing that she was the owner of the property and had not received notice of the hearing should have put any reasonable official in Allen's position on notice that she had failed to meet her due process obligations given Swann's history with the case.

Moreover, it had to be apparent to Allen that Swann had some interest in the property and thus was entitled to notice when Swann's tenant Ms. Kimberly Tracy testified at the hearing about the manner in which *Swann* was maintaining the apartment building at that time and discussed paying rent to Swann. Def's Reply, URSB Hrg. at 1–11. The URSB's chairman specifically asked Swann what *her* plans were for the property and noted that she had been "down here before". Id. at 1–2. In fact much of the testimony at the URSB hearing focused on Swann's, not Hamilton's, control and maintenance of the building. Id. at 1–20. Swann told the board members that the apartment building represented her livelihood. Id. at 14. In response to another URSB member's question Swann responded that she was the owner of the property and that Hamilton was the mortgage holder and that Hamilton had stated that she was not the owner. Id. at 12–13, 18. The URSB dismissed this stating that Swann was not the currently "registered owner" Swann and thus they were not dealing with the right owner. Id. at 18.

Allen and the URSB's insistence that Swann prove she was the registered owner does not comport with due process principles. If she had a protectible interest Swann had a due process right to notice and a meaningful opportunity to be heard. As noted previously, due process extends to less substantial rights than full legal title and has even been found in "a merely arguable right to possession". *Morrison*, 747 F.2d at 613 citing *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972). Additionally, Texas recognizes property interests in lessors and lessees. Krock, supra note 10, at 15 n. 325.

█ Based on the testimony of Ms. Tracy at the hearing, it was clear that Swann was renting and receiving lease payments on the property at the time of the hearing. Defs' Reply, URSB Hrg. 4–13. Assuming *arguendo* that Allen reasonably believed that Swann did not own the building she cannot deny that she and the URSB were fully aware of Swann's status as a lessor. And as a lessor Swann had a protectible property interest under Texas law and was entitled to notice and a meaningful opportunity to be heard prior to a hearing which ordered the tenants evacuated.

█ Finally, Allen cannot rely on Texas law or City Code provisions to support her position that she acted reasonably. To the contrary, the City Code governing the URSB, required the URSB to notify Swann of the demolition hearing under the circumstances present in this case. The Texas Government Code governing municipalities' substandard building ordinances, requires the City to make a "diligent effort to discover each mortgagee and lien holder having an interest in the property", and to notify those individuals of either the hearing or of the order issued after the hearing. Tex. Gov't.Code.Ann. § 214.001d, e, (West 1995). The City code requires that the director give "notice of a hearing to consider repair, demolition, or receiver of a structure or the assessment of a civil penalty against the owner, to the *owner or owners, lessor and occupant of the structure, and any mortgagee or lien holder of record* of the real property concerned." Dallas, Tex., Rev.City Code, ch. 27, Art. IV, §§ 27–13 (emphasis added). The City Code defines an "owner" as "a person *claiming,* or in whom is vested the ownership, dominion, or title of real property." Id. at art. I, § 27–3(14) (emphasis added). That section further provides that notices to be sent and if received by an interested person less than five days before the hearing, the person "shall, upon request at the hearing, receive a resetting of the hearing." *Id.* at art. II § 27–13(b).

█ Given these very clear provisions of the City Code, Allen was required to send Swann notice of the demolition hearing regardless of whether she personally believed that Swann was not the owner on or about August 2, 1994. As administrator for the URSB, it is reasonable that Allen should be aware of the City Code provisions governing their procedures. Allen herself testified that she familiar with these rules. Inj.Hrg.–1 at 82–83, Inj.Hrg.–2. An agency's failure to follow its own rules does not *per se* constitute a violation of due process. *Franceski v. Plaquemines Parish School Bd.,* 772 F.2d 197, 200 (5th Cir.1985) However, this court will consider that failure in deciding that Allen acted objectively unreasonable under the circumstances.[12]

Having now completed the three-prong qualified immunity analysis the court finds that Swann has stated a constitutional claim that was clearly established at the time of the events underlying this action. The court further finds, for the reasons stated in detail above, that Allen did not act objectively reasonable under the circumstances and is, therefore, not entitled to protection under the doctrine of qualified immunity.

### 2. Defendants Lopez, Rivera, and Thompson

#### a. Violation of Constitutional Right

Defendants Lopez, Rivera, and Thompson also seek protection under the qualified immunity doctrine from Swann's allegations that they violated her Fourth Amendment rights when they entered and inspected her apartment building. Applying the same three-part analysis utilized for Allen's claim of qualified immunity, the court asks first whether Swann has stated a constitutional violation with regard to these three defendants. Plaintiff contends that these defendants entered her property without her permission in violation of her constitutional rights.

---

12. See *Perez v. City of Chicago,* No. 95 C 685, 1995 WL 410981, at *6 (N.D.Ill. July 10, 1995), where the court held that because city officials had followed the existing procedures for notification which did not require notice to anyone other than owners of record their conduct was objectively reasonable, and they were entitled to qualified immunity. *Id.*

**1202**

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures by government officials. *Michigan v. Tyler*, 436 U.S. 499, 504, 98 S.Ct. 1942, 1947, 56 L.Ed.2d 486, 495 (1978). The Supreme Court has held that this protection extends beyond the situation where a law enforcement officer enters into a private dwelling in search of the fruits of a crime. *Id.* Instead, "the government officials may be health, fire, or building inspectors, and their purpose may be to locate and abate a suspected public nuisance, or simply to perform a routine periodic inspection." *Id.* The *Tyler* court stated that searches for administrative purposes as with those based on law enforcement objectives, are encompassed by the Fourth Amendment. "And under that Amendment, 'one governing principle,' justified by history and by current experience has consistently been followed; except in carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Id.* at 506, 98 S.Ct. at 1948, 56 L.Ed.2d at 496 (other citations omitted).

In an administrative search to enforce a local code, "probable cause to issue a warrant to inspect exists if reasonable legislative or administrative standards for conducting inspection are satisfied." *Tyler*, 436 U.S. at 506, n. 5, 98 S.Ct. at 1948, n. 5, 56 L.Ed.2d at 496, n. 5. Consent to the search of a residence provides an exception to the warrant requirement. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990).

Given the foregoing authority, Swann has properly stated that a right secured to her under the United States Constitution was violated when she alleges that City Code Inspectors entered and inspected her apartment building and the individual apartments without a warrant and without consent.

*b. Clearly Established Constitutional Right*

In deciding whether or not the type of inspections Swann claims Lopez, Rivera and Thompson conducted in this case violated clearly established constitutional rights, the court relies on a well-settled Supreme Court authority and the Dallas City Code.

As stated previously, it is clearly established that warrantless and administrative searches are unreasonable under the Fourth Amendment. *Tyler*, 436 U.S. at 506, 98 S.Ct. at 1948, 56 L.Ed.2d at 496. The *Tyler* court described this principle as "consistently ... followed." *Id.* In emphasizing the necessity for a warrant for administrative searches, the *Tyler* court directs that probable cause may be found based upon the satisfaction of reasonable legislative or administrative standards for conducting an area inspection. *Id.* at 506, n. 5, 98 S.Ct. at 1948, n. 5, 56 L.Ed.2d at 496, n. 5. With this in mind, the court turns to the standards under the Dallas City Code which authorize City Code inspectors to obtain search warrants to inspect particular premises.

DALLAS, TEX., REV.CITY CODE ch. 27, art. I, § 27–3.1.

The Dallas City Code authorizes the director or designated code enforcement officials to inspect:

(1) the exterior of a structure and the premises which contain no structure; and

(2) the interior of a structure, *if the permission of the owner, occupant, or person in control is given.*

Id. at art. II, § 27–5 (emphasis added), see also, § 27–3.1.

A property may be secured if the director determines that the structure:

(1) violates a minimum standard established in Article III of this chapter; *and*

(2) *is unoccupied* or is occupied only by a person who does not a right of possession to the structure.

Id. at § 27–16(a) (emphasis added).

Given the above Supreme Court authority and the specific provisions of the Dallas City Code authorizing the circumstances under which the City may inspect premises, this Court finds that Swann has alleged a violation of a constitutional right that was clearly established at the time Lopez, Rivera and Thompson inspected her

building without her or her tenants' permission.

### c. Objective Reasonableness

█ The court makes the assessment of whether officials acted objectively reasonable in light of legal rules clearly established at the time of the incident. Determining the objective reasonableness of conduct "will often require examination of the information possessed" by the official. *Salas*, 980 F.2d at 311. Qualified immunity should be granted if a reasonable official would be left uncertain of the law's application to the facts confronting him. *Id.* citing *Hopkins v. Stice*, 916 F.2d 1029, 1031 (5th Cir.1990).

Based on their affidavits submitted in conjunction with the defendant's motion for summary judgment and the testimony of Rivera and Lopez at the injunction hearings, it is not disputed that these officials inspected Swann's apartment building in December, 1994, and January, 1995. However, it is far from clear whether they were authorized by law to do so.

In his affidavit and testimony at the June, 1995 injunction hearing, Ramiro Lopez states that Swann's building was inspected on December 15, and December 29, 1994. Defs' Mot. for Summ.J., Lopez Aff. At the injunction hearing he testified that no one was living in the apartments when they went out to inspect them in December of 1994. Inj. Hrg.–2, 185. He stated that Mr. Briscoe, an employee of Ms. Swann, gave them permission to come in and inspect the apartments. *Id.* at 186.

In Vitale E. Rivera's affidavit, he states that he inspected the interior and exterior of Swann's property on December 15, and December 29, 1994. He stated that on December 15, the property was vacant. Rivera Aff. He states further in his affidavit that on December 29, when he inspected the property, one of the eight units was occupied. *Id.* In contrast, in his testimony at the March, 1995 injunction hearing, he stated that on both the 15th and the 29th of December, 1994, during his inspections, he found people living on the premises. Inj.Hrg.–1 at 17, 23, 30. Rivera testified that on the December 15th inspection he inspected the occupied

apartments because they were open. Inj. Hrg.–1 at 31. Rivera testified that it was unnecessary to ask the owner for permission to go in the building because he had "probable cause." *Id.* Rivera later cited a Chapter 27 of the City Code as authority for boarding up the building in December, 1994. *Id.* at 43. He stated that the building was open including the entrance and the doors to the apartments. *Id.* at 44. Later he stated that he was authorized to secure Swann's building because it was vacant. *Id.* at 57.

█ In Thompson's affidavit she states that she personally inspected Swann's property on December 15, 1994 and that on that date the property was open and vacant. Thompson Aff. All three defendants, Rivera, Thompson and Lopez state that they relied on the URSB's demolition order in good faith in inspecting plaintiff's premises.

In reviewing the summary judgment evidence as to whether or not these three defendants acted objectively reasonable in inspecting Swann's premises, the undersigned finds unresolved questions of material fact which preclude a granting of qualified immunity. First, the clearly established provisions of Chapter 27 of the Dallas City Code only authorize the type of inspection which occurred in this case if permission of the owner, occupant, or person in control is given, (27–5), or, if the building is to be secured, it must be shown that it violates minimum standards and is unoccupied. (27–16)

The plaintiff has submitted affidavits from herself, Johnny Briscoe, and a tenant, Craig Cude, all of which state that the inspectors were never given permission to enter the property during the times it was inspected Swann, Cude & Briscoe Affs. In fact, Briscoe's affidavit states that after one inspection he noticed that a window had been newly broken causing him to believe that the inspectors broke into the apartments from the window. Briscoe Aff. Tenant Craig Cude also states that he lived in Swann's apartment building in December, 1994, when the inspectors entered his apartment without his permission Cude Aff. Based on the conflicting affidavits, it appears that there is a material fact question as to whether or not these

three defendants acted objectively reasonable. Not only do the affidavits supplied by the plaintiff conflict with the defendant's statement that the building was vacant, the defendants' own affidavits and testimony at the injunction hearings conflict as to whether or not individuals were living at the apartments and whether or not they were given permission to enter the apartments.

In addition, there is a question as to whether or not the defendant's reliance on the demolition order for their inspection is reasonable. They point to no provision of the City Code authorizing a warrantless inspection of premises based on a demolition order. The demolition order itself contains no language authorizing this kind of inspection. There is no language in the City Code which characterizes the demolition order as a warrant. For these reasons it appears that the only reasonable basis upon which the defendants could have entered plaintiff's apartment building was if it was vacant or they were given permission—both of which are disputed by the summary judgment evidence. For these reasons defendants Lopez, Rivera and Thompson are not entitled to qualified immunity.

### IV. Municipal Liability [13]

■■■ Swann contends that the City of Dallas through the URSB violated Title 42 U.S.C. § 1983 when it deprived her of her property without due process. Section 1983 protects the rights of citizens guaranteed by the Fourteenth Amendment. *Matthias v. Bingley*, 906 F.2d 1047, 1051 (5th Cir.1990) citing *Home Telephone & Telegraph Co. v. Los Angeles*, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913). The defendants contend that "as a matter of law" Swann has not been injured by a policy or custom of the City of Dallas. Swann, on the other hand, argues that the actions of the URSB, acting in a policy making position for the City of Dallas, render the City liable. The applicable law follows.

■■■ There are two elements a plaintiff must prove to establish a cause of action under § 1983, including: 1) that a violation of rights secured by the Constitution or laws of the United States has occurred, and 2) that the alleged deprivation was committed by a person acting under color of state law. *Leffall v. Dallas Independent School Dist.*, 28 F.3d 521, 525 (5th Cir.1994) citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988). (other citations omitted). To establish the liability of a governmental unit, a plaintiff must establish that an "official policy or custom" of that governmental unit was a cause in fact of the deprivation of rights. *Leffall*, 28 F.3d at 525 citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.) (en banc), modified on other grounds on reh'g., 739 F.2d 993 (5th Cir. 1984) (en banc).

■■■ In *Bennett v. City of Slidell*, 728 F.2d 762 (1984), the Fifth Circuit cited the settled principle of *Monell, supra*, that local governments may be the targets of § 1983 actions where official policy or governmental custom is responsible for a deprivation of constitutional rights, but not under a theory of respondeat superior. *Bennett*, 728 F.2d at 766. "[C]ity policy, for which the city may suffer liability, may be made by city lawmakers 'or by those whose edicts or acts may fairly be said to represent official policy.'" 728 F.2d at 768–69. The policy is considered a policy of the city if it is made by an official under authority to do so given by the governing authority. *Id.* A governing body may delegate policy making authority by an expressed statement, by a job description, or by other formal action. *Id.* "The governing body must expressly or impliedly acknowledge that the agent or board acts in lieu of the governing body to set goals and to structure and design the area of delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent or board." *Id.* See also *Neubauer v. City of McAllen, Tex.*, 766 F.2d 1567, 1573–74 (5th Cir.1985). Even a single decision

---

**13.** Although this issue is taken up in connection with the Court's resolution of defendant's motion for summary judgment, both plaintiff and defendants have moved for summary judgment on the issue of municipality liability and the issue is resolved in this section. .

may create municipal liability if the decision is made by a final policy maker responsible for that activity. *Bennett v. Archer County, Texas,* 74 F.3d 578, 586 (5th Cir.1996). Finally, "when a final policy maker makes the relevant decision and that decision is within the sphere of the policy maker's final authority, 'the existence of a well-established, officially-adopted policy will not insulate the municipality from liability'" where a policy maker herself departs from these formal rules. *Id.* citing *Gonzalez v. Ysleta Independent School Dist.,* 996 F.2d 745, 754 (5th Cir.1993). The court looks to state law to determine whether a particular individual or entity is a final decision maker with respect to a certain area of activity. *Id.* (other citations omitted).

■ With the above authority in mind, the Court first determines whether the URSB acts "in lieu" of the City such that its acts represent official policy within the meaning of *Bennett, supra.* To make this determination the Court is guided by Chapter 27 of the Dallas City Code. The Dallas City Code designates the URSB to conduct a variety of functions with the objective of establishing and maintaining certain minimum structural and environmental standards to safeguard the public's health, safety, morals and welfare. Dallas, Tex.Rev., City Code Ch. 27, art. I, § 27–1, art. II, § 27–6. "The director" is defined by the Code as the designee of the City Manager to enforce and administer Chapter 27 and includes representatives, agents or department employees designated by the director. *Id.* § 27–3(6). The board is given a variety of responsibilities in carrying out its objectives including ordering the demolition of a structure found to be a urban nuisance. *Id.* § 27–8(3), § 27–13. Any decisions of the URSB are subject to a rehearing by members of the URSB. § 27–14.2. There is no review of the URSB's decisions by the City Council. Rather, after a URSB decision has become final, the affected property owner may appeal to a state district court. *Id.* at § 27–9(e). In short, Dallas City Code reflects that the URSB acts in lieu of the City of Dallas in setting goals in structuring its area of delegated responsibility. This kind of binding policy making authority constitutes the kind

of "official policy" for which the City may be held liable. *Neubauer,* 766 F.2d at 1573 citing *Webster v. City of Houston,* 735 F.2d at 841. Chapter 27 reflects that the URSB, and the URSB alone, sets and carries out the policy for the City of Dallas with regard to establishing minimum standards applicable to residential and nonresidential structures. Dallas, Tex., Rev.City Code Ch. 27, art. I, § 27–2. The URSB is thus an official policymaker for the City in this area of responsibility rendering the City liable for its actions.

■ Having determined that the URSB is the City's official policymaker in its area of responsibility, thus leaving the City vulnerable for the URSB's actions, the Court must next determine whether or not the URSB's actions with regard to Swann, as a matter of law, render the City liable in this case. In making this decision, the Court is mindful that it is governed by summary judgment principles. In short, it must be decided whether the undisputed facts mandate judgment as a matter of law for plaintiff or defendant. The facts favor Swann in this instance.

First, for purposes of § 1983, it is undisputed that both Allen and the URSB were acting under color of state law at the time of the actions underlying this suit. Nor is it a point of contention that Swann was not given notice of the August 2, 1994 demolition hearing and that the URSB and Allen were made aware of this fact at the hearing. The pivotal issue in this summary judgment analysis is whether the undisputed summary judgment facts establish as a matter of law that Allen and the URSB possessed the requisite mental state to deprive Swann of her property.

■ The due process clause does not protect individuals from negligent acts of officials. *Salas,* 980 F.2d at 306 citing *Daniels v. Williams,* 474 U.S. 327, 334, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986). The Fourteenth Amendment protects against deliberate abuses of governmental power. *Id.* In discussing the requisite mental state for § 1983 liability, the Fifth Circuit has stated, however, that municipal liability can result from conduct by the governmental entity manifesting a "deliberate indifference to the constitu-

tional rights of its citizens." *Doe,* 15 F.3d at 453, see also *City of Canton v. Harris,* 489 U.S. 378, 389, 388, 109 S.Ct. 1197, 1200–01, 1204, 103 L.Ed.2d 412, 421–22, 426 (1989). The court in *Doe* extended this deliberate indifference standard to supervisory liability stating: "[w]e see no principled reason why an individual to whom the municipality has delegated responsibility to directly supervise [an] employee should not be held liable under the same standard." *Id.* at 453. Deliberate indifference has been defined as a "lesser form of intent". *Id.* at 453 n. 7 citing *Germany v. Vance,* 868 F.2d 9, 18 n. 10 (1st Cir. 1989). Recognizing that the facts in *Doe* do not square with those at hand, this court, nevertheless, adopts its standard for municipal and supervisory liability.

Applying these principles to the undisputed facts in this case results in a finding of judgment as a matter of law against the City. The record establishes that the URSB and Allen knew that Swann had protected property interest in the building at the time of the hearing and failed to accord her due process. The undisputed facts show that they had this knowledge for several reasons. First, as noted in a previous section, Swann's name was all over the URSB file. The URSB ordered the demolition of Swann's property after she arrived at the demolition hearing claiming that she was the owner of the property and had not received notice of the hearing. Defs' Reply URSB Hrg.Tr.1–25. The chairman recognized Swann as having been "down here before" and asked what her plans were for the property. *Id.* at 2. And it was Swann's failure to comply with previous board orders to her that caused the demolition hearing to be set.

Additionally, the testimony at the hearing further supported that Swann's had an interest in the property. Swann's tenant provided testimony to the URSB on how *Swann* was maintaining the building and renting out apartments. Id. at 4–9. Tracy testified that Swann was presently under court order to provide her with electricity. Id. at 5. The chairman acknowledged that Tracy had the

judgment. Id. at 7–8. A City Code inspector testified that he was unable to inspect the building on the day of the hearing because of a phone call of a threat. Id. at 3. The URSB file establishes that it was Swann who made the threat. Ex. J, K.[14]

That the URSB was deciding on the demolition of a piece of property and Swann was the only one there to protest should have clued the entire URSB into the fact that Swann had a protectible property interest at stake. Every indication at the hearing was that Swann owned, maintained and rented-out units at the targeted property.

The URSB relies heavily on the substitute trustee's deed procured by Allen from a title search. However, given the mountain of proof that Swann owned the property at the time of the hearing, the title falls short as summary judgment proof. The URSB has not disputed Hamilton's attorney's letter submitted with Swann's summary judgment materials that the deed was not valid due to Swann's bankruptcy. Moreover, this document is not of the quality upon which a reasonable jury could base a verdict for the City or Allen. As noted previously this deed was filed two years prior to the demolition hearing. The URSB had not used it to determine ownership prior to the September, 1992 hearing. Now, however, it provides their key piece of proof. The URSB had to be cognizant of the incongruity in finding that an individual who had ostensibly lost title to her property two years prior was still renting it out and was under a court order to provide electricity. In short a reasonable jury would not accept this as true and neither does the court.

In sum the URSB was made aware of its failure to properly notify Swann of the demolition prior to ordering the demolition of her property. Although it may initially have been Allen's responsibility to send out notices the URSB was made fully aware of this deficiency prior to ordering demolition and failed to correct the error. For the city to argue now that Swann failed to request a reset of the hearing completely ignores its

---

**14.** The opinion should not be read as an implicit approval of Swann's actions in this case. Whether Swann was an acceptable landlord, or her property substandard is not in issue at this point. Rather, the question is whether she was deprived of her property without due process.

due process obligations. Swann was entitled to a meaningful opportunity to be heard—period. Finding out about the hearing shortly before its commencement did not enable her to organize witnesses and documents necessary to meet the code inspector's proof after more than two years of investigation. See Swann Aff. at 2. It would have presented a minor inconvenience to the URSB to reset the hearing so that Swann could organize her proof and prove ownership. In contrast, not doing so cost Swann her property.

At best, the undisputed summary judgment proof establishes that the URSB was deliberately indifferent to Swann's due process rights. For the reasons stated above they had ample evidence that Swann had a protectible property interest in the building. They knew without question that she had not been notified of the hearing, yet they proceeded to order her building demolished. For these reasons the court find that judgment as a matter of law should entered against the City of Dallas in this case.

### V. Allen's Liability

 Although the issue of Allen's liability has been raised in both motions it will be addressed only once in this section. For many of the same reasons this court found the URSB liable, Allen also faces liability in this case. Ms. Allen's broad responsibilities caused her to be directly involved in this case and in many ways responsible for the action ultimately taken by the URSB in this case. Although the proof does not establish that she selects and initiates cases, as a prosecutor does, nevertheless, she does have many responsibilities. As the board administrator for the URSB Allen is responsible for submitting cases, maintaining records and sending out notices of URSB hearings. Inj.Hrg.–1 at 61. She also represents the board in state district court. *Id.* Allen prepared Swann's file for the hearing, was present at the demolition hearing and heard Swann's claims of ownership. *Id.* at 66. It was Allen who undertook the request for a title search upon which the URSB relied in denying Swann's claims of ownership. Inj.Hrg.–2 at 168–69, URSB Hrg. at 1–3. And Allen was directly involved in the demolition hearing.

She specifically stated to the board at the hearing that ".. As I pointed to Ms. Swann before her case today .. and I showed her a copy of the document. We do show the deed where this property was .. the title was transferred over to Ms. Hamilton ... If Ms Swann has regained possession of the property, there is no record of it.." URSB Hrg. at 3. It was also Allen who determined that Hamilton, not Swann, should be notified of the demolition hearing in reliance on the title search. Inj.Hrg.–2 at 165–67. Allen was responsible for the fact that even Hamilton never received notice of the hearing. This was in spite of Allen's knowledge that Swann had been notified as the owner for the previous hearings. *Id* at 166. Allen has also been directly involved in dealing with Swann and her property since the demolition hearing. *Id* at 170–71, Inj.Hrg.–1 at 67–69. Swann's tenants came to Allen's office regarding the demolition order after the hearing.. Id at 70. Allen has been involved in meetings with Swann regarding this property after the hearing and continued to insist that Swann prove ownership. Inj.Hrg.–2 at 171.

In sum, Allen was directly involved in the events underlying Swann's property loss. The undisputed summary judgment facts establish that it was Allen who caused the title search to be undertaken, causing the board to rely on it in deciding ownership. She presented the title to the board and was present at the hearing when Swann claimed she was still the owner and had not received notice of the hearing. As the administrator for the URSB she was at least as familiar with Swann's background with the case as the board. Yet she provided a two year-old title to the board to establish ownership when she had not used this same document two years before at the September, 1992 hearing.

These facts establish a deliberate indifference on the part of Allen to Swann's property rights. Without repeating what has been stated in previous sections, based on the foregoing facts judgment should be entered against Allen in her personal capacity in this case.

### VI. Conspiracy

 Swann alleges that the defendants conspired to violate her constitutional rights.

Defendant claim that, as a matter of law, the City of its official cannot conspire within the meaning of § 1985.

Under 42 U.S.C. § 1985, if one or more persons

do, or cause to be done any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property or deprived of having and exercising any right or privilege of a citizen the United States, the party so injured or deprived may have an action for the recovery of damages, . . . . against any one or more of the conspirators.

42 U.S.C. § 1985(3) (West 1994). Although it is true that corporation cannot conspire with itself, a conspiracy may be established where individual defendants are named and those defendants act outside the scope of their employment for personal reasons. *Garza v. City of Omaha,* 814 F.2d 553, 556 (8th Cir.1987).

 Allen, Lopez, Rivera, and Thompson are named as individual defendants in this suit and the Court has not found that they are immune from personal liability. At this point, therefore, these individual defendants may be held liable for conspiracy under § 1985. Since there are unresolved issues of fact regarding this issue, Swann's conspiracy claims must also be resolved by the jury.

### VII. Disposition of Plaintiff's Motion for Summary Judgment

Swann claims she is entitled to summary judgment for the violations of the City, the URSB, the URSB members and Allen. As previously discussed, the URSB members, Gaines, Swint, Bonilla, Owen and Smith are entitled to absolute immunity. Therefore, as a matter of law, Swann's claims against these officials in their individual capacities are barred. Factual issues regarding the qualified immunity of Lopez, Smith and Thompson must be resolved by the jury before the issue of their liability can be resolved. The liability of the City of Dallas and Allen have been decided in the foregoing section and will not be repeated.

### VIII. Conclusion

For the foregoing reasons, it is **OR-DERED** that **Defendant's Motion for Sum-** mary Judgment and Plaintiff's Partial Motion for Summary Judgment be **GRANTED in part and DENIED in part as follows:**

The Court specifically **Finds and Orders** that Gaines, Swint, Bonilla, Owen and Swint are absolutely immune from personal liability.

The Court further **Finds and Orders** that Lopez, Rivera, and Thompson are not absolutely immune, however, the issue of their qualified immunity must be resolved by the jury.

The Court further **Finds and Orders** that the City of Dallas is liable as a matter of law for the actions of the URSB.

The Court further **Finds and Orders** that Allen is not entitled to qualified immunity for her actions and is liable as a matter of law in her personal capacity.

All other relief sought not specifically **Granted is Denied.**